**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ESTATE OF YEVGENYI A. SCHERBAN;<br>ESTATE OF NADEJDA NIKITINA;<br>EYVGENYI E. SCHERBAN;<br>RUSLAN E. CHTCHERBAN;<br>YEVGEN E. SCHERBAN<br>(all Ukrainian parties)<br><br>       Plaintiffs<br><br>    -vs-<br><br>SUNTRUST BANK, aka SUNTRUST<br>BANKS INC. (national bank);<br>GWYNFE HOLDING LTD. (a British Virgin<br>Islands company, at: Waterfront Drive, P.O.<br>Box 903, Roadtown, Tortola, BVI);<br>ALEXEY ALEXEENKO (314 3rd Ave<br>Kirkland, WA 98033  )<br>and DOES from 1 to 10<br><br>       Defendants | CIVIL ACTION<br>DOCKET No.<br><br>**COMPLAINT**<br><br>**FOR DAMAGES AND ORDERS BASED<br>ON:**<br>**1. CONVERSION OR CONFISCATION<br>OF FUNDS AT BANKING<br>INSTITUTION;**<br>**2. BREACH OF CONTRACT;**<br>**3. NEGLIGENCE IN VIOLATION OF<br>BANKING REGULATIONS;**<br>**4. BREACH OF FIDUCIARY<br>OBLIGATIONS;**<br>**5. FRAUD AND MISREPRESENTATION;**<br>**6. ACCOUNTING;**<br>**7. DECLARATORY RELIEF** |

**I. NATURE OF ACTION**.

This action is for recovery of all and any assets on the accounts of two deceased persons as well as of related accounts that have been either converted, or may still remain at the bank entity, Defendant in this action. The action is brought by the estates of the two deceased persons and by their three direct heirs (children), whose rights have been determined (in the sense of adjudged) in Ukraine under its laws. This action is also for accounting as well as for declaratory relief, in light that the heirs of the deceased have been unable to obtain the records concerning the accounts at issue, to date. The present action is related to another action, brought by the same Plaintiffs, *Estate of Scherban et al. v. Merrill Lynch et al.*, 14cv6312-VSB, in the U.S. District Court for the Southern District of New York, also for recovery of the assets for the heirs.

1

## II. PARTIES.

1.      Plaintiff Estate of Yevgenyi Alexandrovich Scherban, aka Evgueni Chtcherban, aka Yevgen Shcherban, aka Evgen Shcherban Yevgen, aka Evgen Shcherban, aka Evgueni A. Chtcherban, aka Evgueni Chitcherban  ("Scherban") is the estate left and remaining after the death of Scherban, who was born in Konstantinovka, Ukraine, on January 18, 1946. Scherban, a Ukrainian national at all times during his life time, obtained a professional education at the technical college in Donetsk, Ukraine, and then continued his education at the Donetsk Polytechnical Institute (University).   In the early 1990s, Scherban set up a cooperative enterprise named Progress, later becoming a holding enterprise Aton.  By the mid-1990s, Scherban controlled several other enterprises, including Amest, Finansist, SP Gefest that owned a network of gas stations in Ukraine.  Scherban was one of the richest businessmen in Ukraine in the mid-1990s. On November 3, 1996, Scherban was murdered in Donetsk, as a result of a contract murder conspiracy.  The estate was set up under the authority of the notary public, at the address: 12 Ivana Mazepy Street, Kyiv, 01010, Ukraine, whose determination can be equated to adjudication.

2.      Plaintiff Estate of Nadejda Nikitina, aka Nadyia Niktina ("Nikitina") is the estate left and remaining after the death of Nikitina, the spouse of Scherban.  Nikitina was born in Donetsk, Ukraine, on July 31, 1963.  Nikitina died on November 3, 1996, as a result of the same murder conspiracy in Donetsk, Ukraine, together with Scherban.  Nikitina is the mother of the third son of Scherban, as cited hereinafter.  The estate was set up in Donetsk, Ukraine, in a similar mode as the estate of Scherban, by the notary public, at 12 Ivana Mazepy Street, Kyiv, 01010, Ukraine, whose determination, likewise, may be equated to adjudication.

3.      Plaintiff Evgenyi E. Scherban, aka Evgueni Chtcherban, aka Evgueni Scherban, aka Ievgen Shcherban ("Evgenyi") is the elder of the three children (all three sons) of Scherban.

Evgenyi was born on March 15, 1970, in the first marriage of Scherban, to Tatiana Nikolaevna Scherban.  Evgenyi's current address is: 16 Ivana Mazepy Street, Apt. 20, Kyiv, Ukraine.  Evgenyi is an entrepreneur in Ukraine.  Evgenyi is Plaintiff in this action because he is the lawful heir of Scherban; he has a lawful claim to his estate and assets.

4.      Plaintiff Rouslan E. Chtcherban, aka Rouslan Scherban, aka Rouslan Shcherban, aka Ruslan Scherban ("Ruslan"), born on January 13, 1977, is the second son of Scherban.  Rouslan is the second child from the second marriage of Scherban, to Vera Dmitrievna Scherban.  Rouslan's current address is: Prospect Dzerjinskogo 66B, Apt. 23, Donetsk, Ukraine.  Rouslan is an entrepreneur and he has interest in the banking business in Ukraine.  Rouslan is Plaintiff in this action because he is the lawful heir of Scherban; he has a lawful claim to his estate and assets.

5.      Plaintiff Yevgen Chtcherban, aka Yevgenyi E. Scherban ("Yevgen"), born on December 11, 1982, is the third and youngest of the three sons of Scherban.  Yevgen's current address is: 153 Kirova Street, Apt. 39, Donetsk, Ukraine.  Yevgen was born in Scherban's last marriage, to Nikitina.  Yevgen is an entrepreneur in Ukraine.  Yevgen is the Plaintiff in this matter, because he is one of the lawful heirs of Scherban and of Nikitina; he has a lawful claim to their respective estates.

6.      Defendant SunTrust Bank, aka SunTrust Banks Inc. (also "SunTrust") is a national banking institution having about $175 billion in assets (as of 2014) and having branches in Washington, D.C.  SunTrust's corporate parent was first established in 1891 in Atlanta, Georgia, where its headquarters remain.  SunTrust operates, according to the latest public information, about 1,497 bank branches and 2,243 ATMs.  Apart from Washington, D.C., SunTrust operates branches in Alabama, Arkansas, Florida, Georgia, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia.  SunTrust Bank is owned by SunTrust Banks, Inc., a

holding company, which is publicly traded at the New York Stock Exchange, with the symbol NYSE: STI; its stock is a Standard & Poor's 500 component. The main headquarters of the holding entity are currently located at: SunTrust Plaza, Atlanta, Georgia. SunTrust is subject to jurisdiction of this Court because it has branches in Washington, D.C. and because it regularly does banking business in the District of Columbia.

7.     Defendant Gwynfe Holdings Limited ("Gwynfe") is a company, incorporated under the laws of the British Virgin Islands ("BVI") on or about November 23, 1992, under a local designation as an IBC (international business company) No. 73330, with a nominal stock of $50,000. Its local agent has been Intertrust (BVI) Ltd., located at: Atlantic Chambers, Waterfront Drive, P.O. Box 903, Roadtown, Tortola, BVI. That offshore entity, Gwynfe, was used in a conspiracy to convert $282,000 from the account, to which the Estate of Nikitina and other Plaintiffs have a claim. That conspiracy included a forgery of Nikitina's signature on a banking wire request sent to the bank by fax, after Nikitina was already deceased. Gwynfe is subject to jurisdiction of this Court, because it was an instrumentality of a conspiracy for conversion of funds.

8.     Defendant Alexey Alexeenko, aka Aleksey Alexeenko, aka Oleksy Alekseenko ("Alexeenko") is a former associate and assistant of Scherban, the deceased, until the latter's untimely death in November of 1996. Alexeenko was a holder of co-signature rights on at least two accounts at SunTrust, held by Nikitina and Alexeenko. At the present time, Alexeenko resides at the address: 314 3rd Ave Kirkland, WA 98033. Alexeenko, either a U.S. citizen, or, at a minimum, permanent resident in the USA, is subject to jurisdiction of this Court because he was (or still is) a holder of the rights on an account or accounts at SunTrust and because he, on information and belief, was a participant of the conduct, resulting in the certain documentation withheld from Plaintiffs and certain funds unavailable to Plaintiffs.

9.      Defendants Does, from 1 to 10, are the individual and legal persons, that are not yet known to Plaintiffs or ascertained by available evidence, that have participated in the scheme of the conversion of funds and concealment of documentation, under the claims asserted by Plaintiffs in this action.  For example, Plaintiffs have no documentary proof who owns or has owned Gwynfe, incorporated in the BVI.  Upon discovery of such evidence, Plaintiffs reserve an appropriate right to amend and join additional Defendants in this action.

### III.  JURISDICTION.

10.      This Court has jurisdiction pursuant to 28 U.S.C. §1332.

11.      All five Plaintiffs are, for purposes of diversity of citizenship, citizens of Ukraine.

12.      Defendant SunTrust, a national bank, does business in Washington, D.C. Defendant Gwynfe is incorporated in the British Virgin Islands, but engaged in a conspiracy to convert funds from the account at SunTrust in the USA.  As an alien entity, Gwynfe may be sued in any District.  Defendant Alexeenko is, for purposes of diversity, a citizen of the State of Washington.  As shown below, bringing Alexeenko as a co-Defendant in this action under the long-arm principles of asserting jurisdiction, based on the same nucleus of facts, is proper.

13.      There exists a complete diversity of citizenship of Plaintiffs, on the one hand, and Defendants, on the other hand, in this matter.

14.      This Court has subject matter jurisdiction over the parties because, within the meaning of 28 U.S.C. §1332, the claim exceeds $75,000, the statutory minimum.

15.      This Court has jurisdiction over SunTrust Bank, because it has branches in Washington D.C. and does regular business in the District of Columbia.  SunTrust's branches include, without the limitation the branches at the following addresses: 1445 New York Avenue,

N.W., Washington, DC 20005; 900 17th St NW, Washington, DC 20006; 1100 G Street, N.W., Washington, DC 20005; and 1275 K Street, NW, Washington, DC 20005.

16.     Venue is proper in the District of Columbia, because SunTrust does business in this District, and because all relevant documents, necessary for tracing the funds, and other relevant information, may be obtained in Washington, D.C.

## IV. FACTS.

### A. Creation of the Family Fortune.

17.     After Ukraine became independent in 1991, it started to open up to the free market economy.  That included the Donbass region in the Eastern part of Ukraine (with the regional center Donetsk, nearly a one-million people city), which was the most industrially developed region of that country.

18.     Scherban, who was born, as mentioned above, in Konstantinovka, Ukraine, on January 18, 1946, obtained his professional education at the technical college in Donetsk, Ukraine. He then continued his education at the Donetsk Polytechnical Institute (which is an equivalent of a university-level education).   At the dawn of the market economy in Ukraine, in the early 1990s Scherban set up a cooperative enterprise named Progress, later becoming a large holding enterprise Aton.   Scherban controlled, through the holdings held in the name of Aton, several other enterprises in Ukraine, including Amest and Financier.   Furthermore, Scherban controlled SP Gefest that owned a network of gas stations in Ukraine.

19.     In March of 1994, Scherban was elected to the Rada of Ukraine (the national parliament, upon the first election in the independent country).   Scherban belonged to the parliamentary fraction, called the Social Market Choice.  He was also a member of the Executive Committee of the Liberal Party of Ukraine.

20.     As mentioned above, Scherban was one of the richest business men in Ukraine in the early and mid-1990s.  Scherban was the leading entrepreneur in the Donbass region in Ukraine.  By way of various estimates, the assets under Scherban's control surpassed $100 million.

21.     Scherban was a strong competitor, who was in the way of the criminal groups who sought to deprive Scherban of his business interests and to raid the businesses which he controlled.  As such, Scherban became subject to an assassination conspiracy.  On information and belief, that conspiracy was connected to Scherban's control over the natural gas distribution network and imports for the Donetsk Region in Ukraine.

22.     The murder conspiracy, that resulted in the murders on November 3, 1996, was subject to the extended criminal proceedings in Ukraine and it has been widely published.  After the initial lack of progress in the investigation, the conspiracy was uncovered in approximately 2000.

23.     The investigation and subsequently the criminal trial determined that the murder conspiracy was implemented by two members of a criminal gang.  The gang that executed the assassination was headed by Alexander Milchenko ("Milchenko") and Yevgen Kushnir ("Kushnir"), who were both subsequently killed.

24.     That gang put into motion on November 3, 1996 a murder conspiracy where two men posing as police officers, with concealed firearms, and one man dressed as a flight technician entered the tarmac of Donetsk airport.  The conspirators awaited on the tarmac of the airport Scherban's arrival by a private plane.  Scherban, Nikitina, Rouslan and several other persons came from the plane to the awaiting car.

25.     The gunmen were Vadim Bolotskikh ("Bolotskikh") and Gennadiy Zangelidi ("Zangelidi").  Bolotskhih and Zangelidi used on the tarmac the firearms, whereas other gang

members awaited them, with a getaway car, behind the wall of the tarmac of the airport.  The gunmen killed Scherban and Nikitina.  They also shot dead two more persons who happened to be closeby and seriously wounded one more.  Rouslan, as mentioned above, was among the persons who arrived by the plane, but he escaped the bullets fired by the above two gunmen.  After the assassination, all the participants in the conspiracy fled.

26.     The Ukrainian prosecution has claimed that the conspiracy was a result of a contract murder, for the alleged amount of $3 million, out of which actually the total of $2,497,000, paid in several transfers, was transferred to the accounts controlled by Milchenko and Kushnir in Antigua and in Austria.

27.     In 2002, eight men belonging to the gang headed by Milchenko and then by Kushnir, were arrested and tried for the murder.  All of them were found guilty, with three of the convicts receiving life sentences.  That included Bolotskikh, who received a life sentence and is serving his sentence in Ukraine.

28.     Ukrainian prosecutors have stated that the murder was intended to eliminate competition for control of Ukraine's natural gas industry, particularly from the side of United Energy Systems of Ukraine, PFG.

**B.  Inheritance, Estates, and Claims of Heirs**

29.     As stated above, on November 3, 1996, Scherban and Nikitina were murdered in Donetsk, as a result of a contract murder conspiracy.  The murder took place on the tarmac of the airport in Donetsk.

30.     The rights and claims of their heirs were resolved in Ukraine in the course of the proceeding before the notary public's office in Donetsk, Ukraine, in accordance with the laws of Ukraine.  Those rights and claims were governed by Article 529 of the Civil Code of Ukraine.

Under the laws of Ukraine, in accordance with the traditions of the continental law countries, where notaries have considerable legal powers, the notaries' determinations concerning rights of heirs to the estates are considered to be equated to the judicial determinations of probate courts in the U.S.

31.     Article 529 of the Civil Code of Ukraine prescribes that the heirs of the deceased have the lawful claims to the assets left after his/her death wherever such assets may be located. The said Article also prescribes that any material or monetary form of the assets does not make any difference for purposes of the heirs' rights and that the heirs have the lawful claims to any and all such assets.

32.     In particular, the above enumerated individual plaintiffs, all three sons of Scherban, were determined in Ukraine to be the lawful heirs of Scherban.  Additionally, Yevgen, the younger brother of the three sons, was determined also to be the lawful heir of Nikitina, with an interest in her estate.

33.     Plaintiffs are ready and willing to disclose before the Court and to Defendants the complete Ukrainian documentation concerning their inheritance rights, in due course, subject to respecting their legitimate considerations of privacy.

**C. Accounts at SunTrust Bank Subject to the Inheritance and Other Claims.**

(i)  The Scherban Family Establishing Client Relationship with SunTrust.

34.     In the early and mid-1990s, prior to his death on November 3, 1996, Scherban, the main provider of the family, acting through Nikitina, Ruslan, his assistants, including Alexeenko, and otherwise, set up at least three accounts at SunTrust, for himself and for the certain members of his family.

35.     Those accounts were set up, at a minimum, with the branch located at 800 S. Federal Highway, Boca Raton, FL 33432.  The managers who were involved in handling the account included Russell T. McAndrew ("McAndrew") and Janice Bucher ("Bucher").  Furthermore, to the extent that the fraudulent wire transfer was processed, these employees included also Lori Bertram ("Bertram"), eventually associated with the wire processing center at the bank's office in Fort Lauderdale, Florida.  Plaintiffs have no information whether any of these persons are still employed by TrustBank nor aware of involvement of other employees of the bank in the facts and transactions below.

36.     At the relevant times, the family of Scherban, primarily the couple of Scherban and Nikitina, also had a property in New York City, where they resided from time to time, together with the children.  Scherban and Nikitina, as well as occasionally the sons also resided at: 211 Alexander Palm Road, Boca Raton, FL 33432-7906, which property Scherban acquired in or about 1994.  That property was subsequently sold by the heirs.  That address could be indicated on some of the accounts of the family at SunTrust.

(ii) Checking account # 0494000053002

37.     In or about 1994, Scherban set up, among other accounts, a checking account, with two nominee beneficiaries, stating their names on the account, namely Nikitina jointly with his assistant and manager Alexeenko.  All funds deposited on, or wire transferred to, that account, came from Scherban's businesses, the main or sole provider in the family.  The intended beneficiaries were all the members of the family, including Scherban, Nikitina, and three sons.

38.     Even though Alexeenko was named on the account, he was not an intended beneficiary, but acted as a facilitator, as a part of his regular work functions in the staff working for Scherban in New York and sometimes in Florida, as well as in Ukraine.

39.     On repeated occasions after the deaths in November of 1996, Plaintiffs attempted to approach the representatives of SunTrust, in order to find out information and collect records concerning that account, unsuccessfully.  Likewise, Plaintiffs repeatedly contacted or attempted to contact Alexeenko, asking for information and records.  Although Alexeenko first provided some, but not all, information, the most important records remained undisclosed and missing.

40.     In particular, Alexeenko did not respond to the latest written requests, undertaken by Plaintiffs in October of 2015, leaving to them no other option, but to name Alexeenko as a co-Defendant in this action, for purposes of at least compelling to provide all records, concerning that account and the account cited below, that are or may be in his possession, and to disclose his knowledge on the conversion or confiscation of funds through Gwynfe, addressed below.

(iii) Savings Account # 304940117025216.

41.     In or about 1994, Scherban set up, among other accounts, a savings account at SunTrust, designating two direct beneficiaries and names on the account, namely Nikitina and Ruslan.  As mentioned above, that designation of signatories on the account was nominal, the main or only provider of all assets was Scherban.

42.     All funds deposited on, or wire transferred to, that account, came from Scherban's business.  The intended beneficiaries were all the members of the family, including Scherban, Nikitina, and three sons.  From the limited information and records uncovered by Plaintiffs in 2014 and 2015, the following facts came to light.

43.     As of October 1, 1996, the beginning balance was $1,072,931.35.  As of December 31, 1996, the ending balance was $802,976.83, that accounted for the fraudulent wire transfer of $282,000 (addressed below), plus a wire transfer fee of $40.00, as well as the accrual of interest.

44.     After Scherban's and Nikitina's deaths in November of 1996, Ruslan, who had spent some time in New York and Florida before, relocated back to Ukraine.

45.     Even though Ruslan was trying to have the mails from SunTrust be routed to Ukraine, none of the mails were actually received in Ukraine.  Ruslan's visa status in the USA expired and he could no longer come back for personal inquiries at SunTrust.

46.     Subsequently, Ruslan was unable to obtain the U.S. visa, but only in October of 2015, in connection with evidentiary proceedings in the related recovery matter, pending in New York.  In that period of time, of almost 20 years, when Ruslan resided in Ukraine, he had no opportunity to approach in person any managers at SunTrust and have his inquiries answered by the managers.  On information and belief, SunTrust has no offices or branches outside of the USA; Ruslan's attempted communications with SunTrust out of Ukraine yielded virtually no results.

(iv) Conversion or confiscation of funds in the name of Gwynfe Holding.

47.     According to the evidence that Plaintiffs obtained in 2015, on or about December 17, 1996, when Nikitina was not alive (namely approximately 1 and ½ months after she and Scherban were killed on November 3, 1996), a fraudulent fax was sent to, and received by, SunTrust, addressed to McAndrew, the senior manager.

48.     The fax, pro verbatim, said the following (captioned letters retained, unedited text): "ATTN: RUSSEL T. McANDREW; FROM: N. NIKITINA; December 17, 1996; Dear Russel: Please consider this letter as a formal request to wire transfer $282,000.00 (Two Hundred Eighty Two Thousand Dollars Even) from my account # 0494-117025216 to the following address: BANK: CZECHOSLOVENSKY ODCHODNI BANKA, A.S.; BANK ADDRESS: NA PRIKOPH 14/11000 PRAHA 1; SWIFT: CEKO CS PP; ACCOUNT TITLE: GWYNFE

HOLDING LIMITED; ACCOUNT NO.: 01-6183203010300 USD.   Sincerely yours, (purported signature) N. Nikitina"

49.     As discovered by now, that informal instruction letter came from a fax No, showing the following fax numbers: 044 4187441, at 6:01 AM, the header on the fax machine saying: Djoan Company.   The country code 44, as it appeared on the fax, is designated to be the U.K. Alternatively, if the country code is skipped, the city code 44 stands for Kyiv in Ukraine.  Plaintiffs are unaware where that fax instruction by a letter really came from, because the header has insufficient information and because the fax machine header could be falsified.

50.     That informal wire transfer authorization, on information and belief, was executed, upon McAndrew's order, by the bank employee responsible for wires processing, Bertram on the next day, December 18, 1996.  On information and belief, Bertram was associated with the Fort Lauderdale office of SunTrust.   Plaintiffs are unaware of any evidence showing SunTrust's performing any due diligence with regard to such an unusual wire instruction.  On information and belief, including the fact that the wire transfer was executed by the next business day, none of those three employees, including but not limited to McAndrew, Bertram or Bucher, undertook any of the steps necessary for verification of the authenticity and legitimacy of the faxed instruction in an unusual form.

51.     It follows that Bertram wired out those funds upon the instruction of McAndrew, acting upon, and choosing to implement, the faxed false instruction in an informal format. Plaintiffs are unaware whether Bucher, the account manager for the Scherban and Nikitina family was involved or was asked by McAndrew for verifications, which were, based on the standard banking regulations, mandatory or required in good faith.

52.     For example, the name of the Czech bank was misspelled in the faxed letter.  The true and correct spelling of the recipient bank's name is actually: Československá obchodní banka, which information could be easily discovered in the world banking institutions' lists and banking information data.  It was SunTrust's obligation to follow on the lead of possible fraud or at least suspect error, that the bank's name did not match its official name.

53.     As a clear indication of an irregularity and non-compliance, the faxed instruction was not on the proper form of the bank, SunTrust, contrary to the elementary banking requirements in the U.S.

54.     On information and belief, none of the three employees involved in that wire transfer, namely McAndrew, Bertram or Bucher, attempted to call by phone the alleged author of the instruction, Nikitina, and/or to get the confirmation on the telephone or by fax, whether Nikitina had indeed written, signed and/or authorized that instruction initiated by fax, ostensibly sent from some foreign jurisdiction outside of the USA.

55.     Had any of these three employees of SunTrust attempted to contact Nikitna by phone, such SunTrust's employees would have found out that Nikitina, together with her husband Scherban, had been killed (in a spree of machine-gun shooting) in the course of the most infamously notable crime in Ukraine about 1 and ½ months earlier.  That event in Ukraine was even covered even by international media.

56.     The faxed instruction contained numerous other "red flags", not only the fact that it was not executed on the proper (or required) banking form and contained a misspelled bank's name in Czech Republic.  Namely, the alleged corporate beneficiary for the wire transfer for $282,000, Gwynfe, did not contain the corporate address, the fact that should have triggered the

due attention of the managers at SunTrust, requiring them to make inquiries on the corporate beneficiary.

57.     As this was discovered in 2015, Gwynfe was actually an offshore entity, incorporated in the BVI.  Gwynfe, incorporated as an international business company on November 23, 1992, had a local IBC No. 73330.  The only publicly available information, as this was discovered in the BVI, is that its local agent has been Intertrust (BVI) Ltd., at Atlantic Chambers, Waterfront Drive, P.O. Box 903, Roadtown, Tortola, the BVI.  Gwynfe's nominal stock was $50,000.

58.     After incorporation, Gwynfe made only one filing, in 1999.  Thereupon, Gwynfe discontinued paying corporate franchise fees and local agent's fees.  Gwynfe was ultimately dissolved in the BVI by proclamation in 2012.  However, under local laws in the BVI, Gwynfe remains available for claims that may be brought against it, in the period of time of up to 10 years after the company's dissolution.

59.     On information and belief, the principal of Gwynfe was a permanent resident of the Czech Republic, by the name Viacheslav Bondarev ("Bondarev").  On information and belief, after Gwynfe in the BVI was abandoned, on December 4, 2001 Bondarev incorporated Gwynfe Holding LLC in the State of Delaware, at the address: 2711 Centerville Rd., Ste 400, Wilmington, DE.

60.     Plaintiffs are unaware whether Bondarev, suspected by Plaintiffs of the conversion of funds, acted in concert with SunTrust or used the gross negligence of SunTrust to fraudulently obtain that money, $282,000, while using a forgery of Nikitina's signature, copying it from other documents that she had signed.

61.     On information and belief, none of the three cited managers of SunTrust attempted to correspond back with the sender, using the same fax machine No., for verification purposes, nor attempted to find out about the corporate entity Gwynfe, that, certainly, had no track record in any commercial sources or yellow pages covering the U.S. and/or the European economies.

62.     As one of the options available to SunTrust, it had the power and the opportunities to correspond by fax, telex or otherwise, with the Czech bank for clarifications concerning the legitimacy and bona fide of a faxed instruction, whose beneficiary was Gwynfe, asking about the address and other information concerning that corporate name.

63.     Although Plaintiffs are unaware of the evidence of the conspiracy that could have included the bank employees at SunTrust to convert and/or confiscate those funds, Plaintiffs allege that such conduct on the part of SunTrust manifested, at a minimum, gross negligence, unacceptable for a banking institution entrusted by clients with substantial funds, as this occurred in this matter.

64.     On repeated occasions, subsequently Plaintiffs attempted to inquire from the representatives of SunTrust, in order to find out about the accounts that rightfully belong to the estate of Scherban and of Nikitina, as well as Ruslan.  However, these approaches were unsuccessful, and no information has been provided to date.  This has ultimately necessitated the present action.

(v) Account # 0494002028327, Other Accounts and/or Assets at SunTrust.

65.     Plaintiffs are aware of the existence of the account No. 0494002028327, possibly a joint account of Scherban and Alexeenko.  As documentary evidence, Plaintiffs possess a copy of a SunTrust check made from the account with that number, signed by Alexeenko, but containing no names on the header of the check.

66.     In addition to the limited documentation reflecting the existence of three identified accounts, set up by, or for, Scherban, as described above, Plaintiffs believe that there were other accounts at SunTrust, to which the estates and the heirs have the rights.

67.     For example, Plaintiffs are also aware of the existence of the SunTrust checking cards in the name of Nikitina, namely: 585048 04940016888 and 585048 04940016896, but Plaintiffs are unaware to which account(s) those were linked.

68.     Additionally, Plaintiffs were aware that at least one bank safe deposit box at a banking institution was set up and used by Scherban in the U.S., most likely at SunTrust.  However, other than oral recollections of witnesses, Plaintiffs do not have documentation on the safe deposit box issue.  Should SunTrust disclose the existence of such a safe deposit box and its contents, Plaintiffs accordingly seek to assert rights to the assets and documentation therein, as appropriate.

**COUNT I.  CLAIM FOR CONVERTED OR CONFISCATED FUNDS DEPOSITED AT BANKING INSTITUTION.**
**(against Defendants SunTrust and Gwynfe)**

69.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs 1 to 68 as if pled again with the same force and effect.

70.     As alleged above, on or about December 17, 1996, when Nikitina was no longer alive (for already about 1 and ½ months by then), a fraudulent fax was directed by a person or persons outside of the USA and received by SunTrust.  It was addressed to McAndrew, the senior manager at a branch of SunTrust.  The faxed instruction was not on a letterhead, not on the proper form for wire transfers originated by SunTrust, and it had an unusual verbiage, quoted above.

71.     In gross contravention of the applicable banking statutes, rules and regulations, that informal wire transfer instruction, on information and belief, was executed by SunTrust, through the bank employee responsible for wires processing, Bertram, on or about December 18, 1996.

72.     As alleged above, none of those three employees involved in that transaction or overseeing the account as managers, McAndrew, Bertram or Bucher, undertook any of the expected steps necessary for verification of the authenticity and legitimacy of that suspect faxed instruction from overseas.

73.     SunTrust grossly failed in its obligation to detect the prima facie indicia of fraud, when even the Czech bank's name was misspelled in the faxed letter.  The true spelling of the bank's name is: Československá obchodní banka, which information could be easily discovered in the banking institutions' information data.  Incidentally, McAndrew's first name, Russell, was also misspelled (one "l" instead of two), although Nikitina was given McAndrew's business card (that Plaintiffs have in their possession).

74.     SunTrust acted negligently or in direct violation of the regulatory instructions, ignoring the facts that the faxed instruction was not on the proper form of the bank itself, SunTrust and contained other clear indicia of fraud.

75.     As alleged above, none of the three employees of SunTrust at the time, involved in that conversion, McAndrew, Bertram or Bucher, attempted to call by phone the alleged author of the instruction sent by fax, ostensibly from some foreign jurisdiction outside of the USA.

76.     Likewise, SunTrust failed to make any verifications on the authenticity of the wire instruction, failing to contact Nikitna and, as a diligent and responsible banker would have done, to make sure they could hear her by telephone, at which time SunTrust would have found out that she had actually been killed in the course of the infamously notable crime in Ukraine, covered by the media.

77.     SunTrust, as though acting "blindfolded", ignored the many "red flags" detectable in that informal instruction by fax, namely that the corporate beneficiary for the wire transfer did

not reveal any address, the fact that should have immediately triggered the due attention of the managers at SunTrust, requiring them to make inquiries.

78.     Had SunTrust acted diligently, it could discover that Gwynfe was merely an offshore entity in the BVI, under IBC No. 73330, with no information showing any legitimate business, having only a mail-box type of an address of its registered agent Intertrust (BVI) Ltd., at Atlantic Chambers, Waterfront Drive, P.O. Box 903, Road Town, Tortola, BVI.

79.     Had SunTrust exercised proper diligence, SunTrust could have discovered that the principal of Gwynfe, on information and belief, was Bondarev, a resident of the Czech Republic, who had no right to send to SunTrust an instruction, claiming, with a forged signature of Nikitina, $282,000.   The issue of a complicity or conspiracy involving SunTrust's employee(s) in that conversion of funds is an open question in this matter.

80.     As alleged above, none of the managers of SunTrust attempted to correspond back using the purported sender's fax machine No., for any verification purposes, nor attempted to inquire on the corporate entity Gwynfe, a BVI entity.

81.     Among other things, in order to avoid acting negligently, SunTrust had to use the opportunities to correspond with the Czech bank concerning the legitimacy of the purported instruction, whose the beneficiary was Gwynfe.   At a bare minimum SunTrust had to inquire about a missing corporate address of the corporate beneficiary.   On information and belief, if the corporate beneficiary's address, located outside of the U.S., were undisclosed in the instruction, SunTrust had no right to wire out funds without documented inquiries and responses on that particular issue of the missing address.

82.     The disclaimer is made as to the time frame.   The evidence on these allegations was obtained as a result of the parallel lawsuit, *Estate of Scherban et al. v. Merrill Lynch et al.*,

14cv6312-VSB, pending in the U.S. District Court for the Southern District of New York.  As a result of a possibility of filing follow-up lawsuits, the heirs benefitted from the opportunities to obtain the various records from Scherban's former contacts.  Such persons, formerly contacts of the deceased concluded that withholding sensitive information could entails their personal liability. Accordingly, the present claim was diligently filed within less than a year after the related other lawsuit was filed in New York and Plaintiffs were able to develop evidence relevant herewith.

83.     Plaintiffs have a lawful claim against all Defendants as to the funds converted or confiscated in the name of Gwynfe, from the savings account indicated above, inclusive any interest accrued since December 17, 1996.

### COUNT II.  BREACH OF CONTRACT.
### (against Defendants SunTrust and Alexeenko)
I

84.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs 1 to 83 as if pled again with the same force and effect.

85.     The disclaimer is made that as to SunTrust, Plaintiffs do not have in their possession copies of the account opening agreements at this time.   Accordingly, Plaintiffs rely on the provisions that must have been, by definition, in account opening agreements.  Plaintiffs also rely on the implied contract between a bank and a customer, where the bank was obligated, among other things, not to participate, directly or indirectly, in the confiscation of funds on the account(s), particularly effected upon orders for the benefit of a suspect offshore entity.  It is also obvious that both the express contract and the implied contract with SunTrust must have included the provisions obligating SunTrust to be diligent in its handling the clients' funds and maintaining accounts.

86.     SunTrust's conduct with regard to at least the savings account was in gross violation of, on information and belief, of the written contract, reduced to the account opening agreement,

as well as of the implied contract, obligating the bank to preserve the clients' funds and to act diligently.

87.    Alexeenko was likewise bound by, at a minimum, an oral contract with Scherban, acting as Scherban's assistant and associate.  The documentary trail in between Scherban and Alexeenko can also be construed that there was a contractual relationship between the two, based on the totality of documents in writing.  It is immaterial that such a contract relationship was not formalized by a formal contract of employment.  As one of the responsibilities of Alexeenko, he was to oversee the several accounts opened for Scherban and his family at SunTrust.  On information and belief, Alexeenko failed to properly oversee those accounts and to subsequently transfer all records to Scherban's and Nikitina's heirs, as called for under the circumstances.

88.    The disclaimer as to the timing of discovery of the disappearance of the $282,000 at issue is made hereby.  The evidence of such conduct and confiscation of funds in the name of Gwynfe became known to Plaintiffs only in the years 2014 through 2015, as a result of the new disclosures triggered by the related recovery case filed in the U.S. District Court for Southern District of New York in August of 2014, as cited above.

89.    Plaintiffs have a lawful claim against Defendants SunTrust and Alexeenko based on breach of contract, such as discovered upon Plaintiffs' obtaining evidence concerning the conversion of funds from at least one account, in favor of an unknown shell entity, Gwynfe, which was discovered to be a BVI company.

### COUNT III.  NEGLIGENCE IN VIOLATION OF BANKING REGULATIONS.
### (against Defendants SunTrust and Alexeenko)

90.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs 1 to 89 as if pled again with the same force and effect.

91.     As alleged above, on or about December 17, 1996, when Nikitina was not alive, a fraudulent fax was directed by a person or persons located outside of the USA and received by SunTrust.  It was addressed to McAndrew, the senior manager at SunTrust's branch.  As cited above, the faxed instruction was not on a letterhead, not on a proper form for wire transfers generated by SunTrust itself, and had an unusual verbiage, quoted in full above.

92.     In gross contravention of the applicable banking statutes, rules and regulations, that informal wire transfer instruction, on information and belief, was executed by SunTrust, through the bank employee responsible for wire transfers' processing, Bertram, acting on McAndrew's orders, on or about December 18, 1996.

93.     As alleged above, none of SunTrust's three employees involved in handling that suspect instruction, McAndrew, Bertram or Bucher, undertook any of the steps necessary for verification of the authenticity and legitimacy of the informal instruction received by fax from somewhere.

94.     SunTrust failed to detect the prima facie indicia of fraud, when the Czech bank's name was misspelled in the faxed letter.  The true spelling of the bank's name is: Československá obchodní banka, which information could be discovered in the banking institutions' information data.  McAndrew was aware that he had given his business card to Nikitina, therefore the author's misspelling his first name on the purported instruction was also suspicious.

95.     SunTrust acted negligently or in direct violation of the regulatory instructions, ignoring that the faxed instruction was not on the proper form developed by the bank itself, and discarding other indications that the letter was fraudulent.

96.     As alleged above, none of the three employees at the time, McAndrew, Bertram or Bucher, attempted to call the alleged author of the instruction sent by fax, Nikitina, ostensibly from some foreign jurisdiction.

97.     SunTrust failed to make any verifications on the authenticity of the wire instruction, failing to contact Nikitna and hear her by telephone, at which time SunTrust's employees would have found out that she had actually been killed.

98.     SunTrust ignored the many "red flags" easily detectable in that informal instruction, namely that the corporate beneficiary for the wire transfer did not reveal any address whatsoever, the fact that should have triggered the due attention of the managers at SunTrust, requiring them to make inquiries, at least as to the beneficiary's corporate address.

99.     Had SunTrust acted diligently, it could discover that Gwynfe was merely a shell entity, incorporated in the BVI, IBC No. 73330, with no information showing any legitimate business, other than the existence of a mail-box address of its local agent Intertrust (BVI) Ltd., c/o Atlantic Chambers, Waterfront Drive, P.O. Box 903, Road Town, Tortola, BVI.

100.    Should SunTrust have exercised proper diligence, SunTrust could have also discovered that the principal of Gwynfe was, on information and belief, a resident of the Czech Republic, Bondarev, who had no right to fax such an instruction, claiming, with a forged signature of Nikitina, $282,000.  The issue of a complicity or conspiracy involving SunTrust's employee(s) is an open question, to be tried in this matter.

101.    As alleged above, none of the managers of SunTrust attempted to correspond back using the fax machine No., for verification purposes, nor attempted to inquire on the corporate entity Gwynfe, a BVI entity.

102.    Among other things, to avoid acting negligently, SunTrust had the opportunities to correspond with the Czech bank concerning the legitimacy of an instruction, whose beneficiary was Gwynfe, at a bare minimum inquiring from that other bank about a missing corporate address of the corporate beneficiary.  On information and belief, if the corporate beneficiary's address were undisclosed, SunTrust had even no right to send funds.

103.    The disclaimer is made as to the timeframe.  The evidence on these allegations was obtained as a result of the parallel case, *Estate of Scherban et al. v. Merrill Lynch et al.*, 14cv6312-VSB, in the U.S. District Court for the Southern District of New York.  As a result of that litigation, the heirs benefitted from expanded possibilities to seek, demand and obtain various records from the former contacts of Scherban.  Such persons, formerly contacts of the deceased, concluded that withholding sensitive information could entail becoming subject to personal liability, hence starting to cooperate.  Accordingly, the present claim was filed within a year after the related other lawsuit was filed in New York when Plaintiffs were able to develop evidence relevant herewith.

104.    Plaintiffs have a claim against Defendant SunTrust for the negligence, contrary to its obligations, which resulted in the funds converted or confiscated in the name of Gwynfe, from the savings account indicated above.  To the extent Defendant Alexeenko could be found Scherban's agent, handling or overseeing his accounts at SunTrust as a trusted person and a professional, he should also be found liable for acting negligently.

### COUNT IV.  BREACH OF FIDUCIARY DUTIES.
### (against Defendants SunTrust and Alexeenko)

105.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs 1 to 104 as if pled again with the same force and effect.

106.    By virtue of acting as a licensed banking institution where the customers were to deposit funds, SunTrust was bound by fiduciary duties.  Among those fiduciary duties, SunTrust

was obligated to preserve the funds deposited by clients and act in good faith with regard to the banking records in the event customers were deceased and, on information and belief, mails were returned from their address as undeliverable.

107.   As alleged above, on or about December 17, 1996, when Nikitina was not alive, a fraudulent fax was directed by a person or persons outside of the USA, being received at SunTrust. Thereby, SunTrust acted on that informal instruction to wire out funds, despite clearly the many "red flags" arising from that unusual document, quoted above, received from somewhere in the world.

108.   In gross contravention of its fiduciary duties, SunTrust, without fulfilling its responsibilities coming with the functions of a banking institution, wired out that amount, $282,000.  As alleged above, none of those three employees involved in that issue, McAndrew, Bertram or Bucher, undertook any of the steps necessary for verification of the authenticity and legitimacy of the faxed instruction.

109.   On his end, Alexeenko, acting as Scherban's assistant and associate, handling funds gained by Scherban in the course of his business, had the implied fiduciary obligations, as an agent before his principal, as well as subsequently before Scherban's and Nikitina's heirs, as called for when the principal was murdered.

110.   The disclaimer is made as to the timeframe of discovery of facts herein.  The evidence on the allegations, showing the breach of fiduciary duties by two Defendants, was obtained as a result of the parallel lawsuit, *Estate of Scherban et al. v. Merrill Lynch et al.*, 14cv6312-VSB, in the U.S. District Court for the Southern District of New York.

111.   Plaintiffs have a claim against Defendants SunTrust and Alexeenko based on the breach of fiduciary duties.

## COUNT V.  FRAUD AND MISREPRESENTATION.
### (against Defendants SunTrust and Gwynfe)

112.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs 1 to 111 as if pled again with the same force and effect.

113.     The informal fax letter to SunTrust, dated December 17, 1996, quoted above, was a prima facie instrumentality of fraud and misrepresentation, when the signature of the account holder, Nikitina, was forged and used for conversion of funds.   A forgery of a signature of a murdered person, to obtain funds from a banking account, is a particularly heinous and despicable type of misrepresentation and fraud.

114.     That fraud and misrepresentation, made in the name of Nikitina, were used in order to cause damages to the heirs of Nikitina, as well as of Scherban.  That falsification in the name of Nikitina was presented to SunTrust, that acted in contravention of its regular responsibilities, causing the conversion and/or confiscation of funds by Gwynfe and unknown persons (one of whom could be Boldarev), who were driven by fraudulent motives.   Plaintiffs submit that SunTrust's conduct, acting 'blindfolded' should be treated as intentional and actionable under the causes of action based on fraud and misrepresentation.

115.     The disclaimer is made that the evidence of fraud and misrepresentation was obtained in the course of the parallel lawsuit *Estate of Scherban et al. v. Merrill Lynch et al.*, 14cv6312-VSB, in the U.S. District Court for the Southern District of New York.   That other lawsuit became instrumental for Plaintiffs' completing the evidence sufficient to formulate the causes of action in this matter.

116.     Plaintiffs have a claim based on fraud and misrepresentation, against Defendants SunTrust and Gwynfe.

//

## COUNT VI.  ACCOUNTING.
### (against Defendants SunTrust and Alexeenko)

117.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs 1 to 116 as if pled again with the same force and effect.

118.    Plaintiffs should be able to obtain any and all documentation related to the accounts, associated with the family of Scherban and of Nikitina, including but not limited to three above identified accounts, particularly since November 3, 1996.

119.    Furthermore, Plaintiffs should be able to obtain documentation concerning the banking plastic cards, identified above, as well as any safe deposit box(es) that may have been rented by Scherban, obtaining the contents, unreclaimed to date.

120.    SunTrust's obligation to provide accounting is based on the applicable provisions of the statutory law and banking regulations.  Alexeenko's obligation to provide accounting is based upon the responsibilities of an agent before his principal (or the principal's heirs).

121.    Plaintiffs are entitled to relief herein against all Defendants, on the claim based on accounting.

## COUNT VII.  DECLARATORY RELIEF.
### (against all Defendants)

122.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs 1 to 68 as if pled again with the same force and effect.

123.    As mentioned above, the estates of Scherban and Nikitina were set up Ukraine, by the Ukrainian notary public, pursuant to the Ukrainian law, namely Article 529 and other laws of Ukraine.

124.    There is a substantial nexus of both deceased to Ukraine, where there were born, lived most of their times and where the family fortune was primarily created.

125.    Likewise, all of the three heirs and Plaintiffs in this action are citizens of Ukraine including for purposes of diversity.

126.    A recognition of the determinations of the notary public in Ukraine as an approximate equivalent to a probate proceedings courts in the U.S.  Those determinations were implemented under the local laws of Ukraine, by the lawfully designated notaries public, and those documents should be subject to full recognition in the District of Columbia.

127.    There is a possible controversy to be resolved, whether the Ukrainian probate law and the particular determinations concerning the estates of Scherban and Nikitina should be recognized and adopted in the District of Columbia.  That controversy, of recognizing the probate determinations from Ukraine made by the Ukrainian notary public, could be appropriately resolved in this action by way of declaratory relief.

128.    A similar relief is sought in the previously filed parallel action, styled *Estate of Scherban et al. v. Merrill Lynch et al.*, 14cv6312-VSB, pending in the U.S. District Court for the Southern District of New York.  However, an adjudication of that claim for declaratory relief under the laws of the State of New York may be deemed insufficient for purposes of the same declaratory relief sought in the District of Columbia.  Therefore, it is restated in this action.

129.    Plaintiffs are entitled to relief based on declaratory judgment relief in the District of Columbia.

Wherefore, Plaintiffs pray for the following relief:

A) – To recover from any and all accounts left after the deceased, Scherban and Nikitina, found at SunTrust, all the remaining balances, monetary and other assets, including interest, and to transfer those to the lawful heirs;

B) – To order SunTrust to compensate and repay to Plaintiffs the allegedly converted or confiscated assets in the amount of $282,000, taken from the savings account on or about December 18, 1996, together with interest and other damages for, at a minimum, gross negligence, in contravention of the banking regulations in force in the USA;

C) – To order SunTrust and Alexeenko to pay damages for breach of contract breach of fiduciary duties and fraud;

D) - To order Suntrust to release to Plaintiffs herein all and any documentation associated with the above identified accounts, as well as any other assets held for the deceased, without limitation.

E) – In the event evidence to be recovered in this action shows more than mere negligence of SunTrust and/or conspiracy to convert and confiscate the funds, then Plaintiffs conditionally assert the claim for punitive and/or exemplary damages based on the conduct of SunTrust, executing a false wire transfer for $282,000, without authority, in violation of express and implied obligations of a banking institution.

F) - To judicially recognize in the District of Columbia and adopt the determination of the rights of the heirs of the estates of Scherban and Nikitina, as those were already lawfully determined under the laws of Ukraine.

Respectfully submitted,

Dated: November 6, 2015

/s/___(George Lambert)
George Lambert, Esq.
D.C. bar #979327
Law Offices G. A. Lambert and Associates
1025 Connecticut Ave., #1000 NW
Washington, D.C., 20036
Tel. (202) 640 1897, Fax (800) 952 1950

## REQUEST OF JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand jury trial

in this action.

Respectfully submitted:

Dated: November 6, 2015

/s/ *George Lambert*

GEORGE LAMBERT (D.C. Bar No. 979327)
LAW OFFICES G. A. LAMBERT AND ASSOCIATES
1025 Connecticut Avenue, #1000, NW
Washington, D.C., 20036
Tel. (202) 640 1897, Fax (800) 852 1950
E-mail: lawdc10@aol.com
Attorneys for Plaintiffs