# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DEBORAH A. TRUDEL, *et al.*,

     Plaintiffs,

       v.

SUNTRUST BANK, *et al.*,

     Defendants.

Civil Action No. 15-1966 (JEB)

## MEMORANDUM OPINION

This case revolves around a decades-old family saga that, as this Court observed in a previous Opinion, reads like the plot of one of John le Carré's Cold War novels. It opens in 1996 with the airport assassinations of Yevgenyi Scherban, a Ukrainian politician and businessman, and Nadejda Nikitina, his wife. Scherban left more than $100 million behind, along with three sons — Evgenyi, Ruslan, and Yevgen — who have since engaged in a global hunt for their missing inheritance.

This latest chapter concerns but a small sliver of the family fortune — namely, one savings account held with Defendant SunTrust Bank at its Boca Raton, Florida, branch. Scherban opened this account around 1994 and deposited more than a million dollars into it. In 2003, the account was apparently closed with no funds remaining, but SunTrust has little explanation for what happened to its balance. More than twelve years later, Plaintiffs brought a twelve-count Complaint, alleging foul play. The Court has since dismissed all but two of those counts, leaving one claim for accounting and one for fraudulent concealment. After protracted discovery, both parties now moves for summary judgment. The Court will grant SunTrust's Motion, thereby closing the book on the Bank's role in this unfortunate tale.

## I.    Background

### A.    Factual Background

The Court outlined the Scherban family history in detail in its previous Opinion.  See Trudel v. SunTrust Bank, 223 F. Supp. 3d 71, 76-81 (D.D.C. 2016).  It therefore limits the discussion here to the aforementioned savings account (with terminal digits 5216) and its often puzzling transactions.  As SunTrust ultimately prevails, the Court recounts these facts in the light most favorable to Plaintiffs, except to note disputes where relevant.

At the outset, the parties debate when exactly Scherban opened this joint savings account. Plaintiffs plead that he did so around 1994, while SunTrust suggests it was opened on March 1, 1995.  Compare Second Amended Complaint (SAC), ¶ 38 with ECF No. 79 (Def. MSJ), Exh. 3 (Affidavit of John A. Barry), ¶ 5.  The ownership of that account is also somewhat murky, but the Court has assumed (to Plaintiffs' benefit) that Scherban designated two direct beneficiaries on the account: Nikitina and Ruslan.  See Trudel, 223 F. Supp. 3d at 78.

Regardless of Ruslan's ownership status, he alleges that he "was not involved in managing" the account, "did not get any copies of any statements from SunTrust," and did not review any such statements.  See ECF No. 31-9 (First Affidavit of Ruslan E. Scherban), ¶¶ 4-5, 10.  He lacked this knowledge because Scherban's assistant, Alexei Alexeenko, was tasked with keeping tabs on the family's American financial interests.  Id., ¶¶ 4, 10 (identifying Alexeenko as the "manager" of the account and speculating that copies of statements from SunTrust were "withheld by Alexeenko, who . . . concealed various documentation from [Ruslan] and from the two other heirs").

With Ruslan left in the dark, the account's balance slowly dwindled.  Before Scherban's and Nikitina's deaths on November 3, 1996, Plaintiffs pled that the 5216 account contained over one million dollars.  See SAC, ¶ 41.  On December 17 of that year, SunTrust received a fax

signed "N. Nikitina" requesting that the Bank transfer via wire $282,000 from Account 5216 to a Czech Republic bank account held by a corporation, Gwynfe Holding Limited. See SAC, ¶¶ 45-46. Among other suspicious circumstances (*e.g.*, Nikitina was deceased), the fax misspelled the name of the Czech bank and did not use SunTrust's wire-transfer form. Id., ¶¶ 52-53. Yet SunTrust employees approved the transfer anyway. Id., ¶¶ 48-51. The family discovered in 2014 or 2015 that Gwynfe was incorporated in the British Virgin Islands until its dissolution sometime after 1999. Id., ¶¶ 57-58. In addition to suing SunTrust here, Plaintiffs named Gwynfe as a Defendant, and the Clerk of Court recently entered default against it. See ECF No. 99. That transfer and Gwynfe's culpability, however, are not before the Court now.

Given the counts that remain, the current controversy instead centers on one question: what happened to the remaining $812,215.93 in the account? The answer is elusive. According to SunTrust, any records related to the 5216 account are long gone, as it retained such information for only seven years after closing the account. Plaintiffs have pieced together several old bank statements, but those records paint only an incomplete picture of the account's activity. A June 30, 1997, statement, for example, shows an unexplained $50,000 debit, leaving a balance (after accrual of interest) of approximately $771,000. See ECF No. 46-5 (Pl. Opp. to MTD), Exh. A. Then, a statement dated March 31, 2001, shows $3,773.04 remaining. See ECF No. 71-2 (Pl. Reply to Mot. to Reopen Discovery), Exh. 5. SunTrust has little explanation of how roughly $767,000 went missing over those nearly four years, other than casually pinning the blame on Alexeenko. See Def. MSJ at 5. For their part, Plaintiffs seem to allege that the Bank has squirreled away the cash. See SAC, ¶¶ 62-65. Finally, SunTrust reports that the account "was closed" in January 22, 2003, apparently with no money remaining. See Def. MSJ at 3; see also id., Exh. 3. It again offers no explanation of where the $3,733 balance went, other than

speculating that the funds "were withdrawn," perhaps by Ruslan.  <u>See</u> ECF No. 87 (Def. Opp. to Pl. MSJ) at 8-9.

Adding to the intrigue, Plaintiffs have also discovered a June 2002 letter, purportedly from SunTrust, sent to lawyers for Nikitina's estate.  <u>See</u> ECF No. 81-5 (Pl. MSJ), Exh. B.  The letter reports that there has been no "client-initiated" activity in the account since March 1, 1995 (<i>i.e.</i>, the day SunTrust says that Scherban opened the account), and that the Bank's statements were repeatedly returned in the mail.  <u>Id.</u>  Defendant has no record of sending this letter, which contradicts Plaintiffs' own evidence showing withdrawals from the account between 1997 and 2001.

B.     <u>Procedural History</u>

On November 6, 2015, the three sons and Scherban's and Nikitina's estates filed the present lawsuit against Defendants SunTrust, Alexeenko, Gwynfe, and Does 1 through 10 (ten unnamed individuals, including Gwynfe employees, who had facilitated the allegedly fraudulent transfer).  <u>See</u> ECF No. 1.  Since then, this suit has undergone several metamorphoses.

One month after filing, Plaintiffs apparently feared that the Court lacked personal jurisdiction over Alexeenko, and so they stipulated to dismissing him without prejudice.  <u>See</u> ECF No. 11 (Notice of Voluntary Dismissal).  Then, following SunTrust's first motion to dismiss, the Court issued an Opinion instructing Plaintiffs to remove the estates as parties, as estates cannot bring a direct suit, and to designate instead the proper personal representative.  <u>See</u> <u>Estate of Scherban v. SunTrust Bank</u>, 2016 WL 777913, at *2 (D.D.C. Feb. 26, 2016). The Second Amended Complaint, which is operative here, named Deborah Trudel (the estate representative), Ruslan, Evgenyi, and Yevgen as Plaintiffs.  The Court subsequently dismissed

these latter two sons, as there was no allegation that either shared a legal interest in the 5216 account. See Trudel, 223 F. Supp. 3d at 81-82.

The remaining two Plaintiffs (Trudel and Ruslan) brought twelve counts in tow, each largely related to the Bank's handling of the account between 1996 and 2003. While Tolstoy once observed that "the two most powerful warriors are patience and time," neither served Plaintiffs terribly well here. On December 12, 2016, this Court dismissed the lion's share of their Complaint, holding that Counts I-VII and XII were all untimely. Id. at 90. These claims — including conversion or confiscation, breach of contract, negligence, breach of fiduciary duty, fraud, unjust enrichment, money had and received, and constructive trust — thus all fell by the wayside. Id. The Court also dismissed counts for declaratory relief (Count IX) and civil conspiracy (Count XI) for failure to state a claim. Id. at 90-91, 94-95.

That left only two counts standing: one for accounting (Count VIII) and one for fraudulent concealment (Count X). Both sides have now moved for summary judgment on the whittled-down claims but not before fighting myriad battles over discovery. The Court describes those disputes in more detail below, but given that history, it is not surprising that Plaintiffs have alternatively moved under Rule 56(d) to forestall summary judgment until they can conduct even more discovery.

## II.     Legal Standard

"When faced with cross-motions for summary judgment, the [C]ourt must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Family Trust of Mass., Inc. v. United States, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (quoting Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)). If the Court determines that one party is not entitled to summary judgment, it "changes tack on the cross motion and gives the unsuccessful movant 'all of the favorable factual inferences that it has

just given to the movant's opponent.'" Nucap Indus., Inc. v. Robert Bosch LLC, No. 15-2207, 2017 WL 1197104, at *6 (N.D. Ill. Mar. 31, 2017) (quoting R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engrs., Local Union 150, 335 F.3d 643, 647-48 (7th Cir. 2003)). It is nonetheless still possible for a court to deny summary judgment to both sides.

Summary judgment is appropriate "only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." Airlie Foundation v. IRS, 283 F. Supp. 2d 58, 61 (D.D.C. 2003) (citing Rhoads v. McFerran, 517 F.2d 66, 67 (2d Cir. 1975)); see also Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); CEI Wash. Bureau, Inc. v. DOJ, 469 F.3d 126, 129 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). The Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). To defeat summary judgment, however, an opposition must consist of more

than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-movant is required to provide evidence that would permit a reasonable jury to find in its favor.  Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  Liberty Lobby, 477 U.S. at 249-50.

**III.    Analysis**

Having considerably narrowed the field, the Court now examines whether Plaintiffs' remaining two counts can survive another round.  Applying Florida law, see Trudel, 223 F. Supp. 3d at 82, the Court first assesses Plaintiffs' claim for an accounting before untangling their various theories of fraudulent concealment.  It then tackles Trudel and Ruslan's discovery-related Motions.

A.    Accounting

In an action for an accounting, a plaintiff broadly seeks from a defendant "a general investigation of all of the transactions between the parties."  1 Florida Jurisprudence 2d: Accounts & Accounting § 32 (2016).  Here, Plaintiffs essentially contend that Scherban opened numerous bank accounts at SunTrust (some unknown and with unknown sums) and ask, as relief, that the Bank reveal what (if anything) is left of those accounts and who has drawn money from them.  See SAC, ¶¶ 154-58; see also id., ¶ 186(E) (requesting the Court "[t]o order SunTrust to release to Plaintiffs herein all documentation associated with the above identified accounts, as well as any other accounts or assets held for the deceased or Plaintiffs in their own names or for their benefit, without limitation").

"Under Florida law, a party that seeks an equitable accounting must show that: 1) the parties share a fiduciary relationship or that the questioned transactions are complex, and 2) a remedy at law is inadequate." Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1071 (11th Cir. 2007). At the motion-to-dismiss stage, this Court could not ascertain whether a fiduciary relationship existed between SunTrust and Plaintiffs, given Defendant's "minimalist briefing" on the issue. See Trudel, 223 F. Supp. 3d at 92. It therefore allowed the claim to proceed while reserving the possibility that it "may . . . be the case that SunTrust owes no [such] duty." Id. In moving for summary judgment, Defendant takes the hint and disclaims any fiduciary duty with Plaintiffs. See Def. MSJ at 6-7. The Court agrees.

"A bank and its customers generally deal at arm's-length as creditor and debtor, and a fiduciary relationship is not presumed." Bldg Educ. Corp. v. Ocean Bank, 982 So. 2d 37, 40-41 (Fla. Dist. Ct. App. 2008); see also Lamm v. St. Street Bank & Trust Co., 889 F. Supp. 2d 1321 (S.D. Fla. 2012) ("Under Florida law, banks ordinarily do not owe fiduciary duties to their customers."). That rule governs, as relevant here, the "relationship between a bank and its depositor." Barnett Bank of W. Fla. v. Hooper, 498 So. 2d 923, 925 (Fla. 1985) (citing Vassar v. Smith, 183 So. 705 (Fla. 1938)). In such a scenario, the Bank's obligations ordinarily "consist[] of the return of the sum deposited upon proper demand" and nothing more. See Lanz v. Resolution Tr. Corp., 764 F. Supp. 176, 179 (S.D. Fla. 1991) (interpreting Florida law); see also Barnett Bank, 498 So. 2d at 927 ("In an arms-length transaction, there is no duty on either party to act for the benefit or protection of the other party nor to disclose facts that the other party could by its own due diligence have discovered.").

Plaintiffs do not dispute this general framework, nor do they argue that this case involves an especially complex transaction. Instead, they maintain that "special circumstances" here

justify departing from the default rule. <u>See</u> ECF No. 89 (Pl. Opp. to MSJ) at 8. It is true that "the Florida Supreme Court has determined that a fiduciary relationship can arise between a bank and its customer from the parties' established relationship of trust and confidence." <u>Arbitrajes Financieros, S.A. v. Bank of America, N.A.</u>, 2014 WL 11369632, at *5 (S.D. Fla. Feb. 5, 2014) (citing <u>Barnett Bank</u>, 498 So. 2d at 518). Such a duty may appear where the bank "takes on extra services for a customer, receives any greater economic benefit than from a typical transaction, or exercises extensive control." <u>Bldg. Educ. Corp.</u>, 982 So. 2d at 41 (quoting <u>Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.</u>, 842 S0. 2d 204, 208 (Fla. Dist. Ct. App 2003)). Florida courts have imposed fiduciary duties when, for instance, a bank's loan officer "urged [the plaintiff] to trust him" and promised a "benefit" from the loan, <u>see Capital Bank v. MVB, Inc.</u>, 644 So. 2d 515, 519 (Fla. Dist. Ct. App. 1994), or where a bank voluntarily assumed extra check-verification services for a depositor. <u>See Breig v. Wells Fargo Bank, N.A.</u>, 2014 WL 806865 (S.D. Fla. Feb. 28, 2014); <u>see also First Nat'l Bank and Tr. Co. of Treasurer Coast v. Pack</u>, 789 So. 2d 411, 416 (Fla. Dist. Ct. App. 2001) (finding fiduciary duty where bank had lent money for mortgage, helped customers find a "builder to go forward with the construction," and assured them that a bank "representative would be present" before closing to detect any defects).

The plaintiff, however, has the burden of demonstrating like circumstances, <u>see Orlinsky v. Patraka</u>, 971 So. 2d 796, 800 (Fla. Dist. Ct. App. 2007), and Trudel and Ruslan proffer no evidence to that effect here. The closest they come is their allegation that SunTrust "knew that both account holders were foreigners, with next to no knowledge of English." Pl. Opp. to MSJ at 8. Under that theory, as soon as SunTrust opened an account for non-local, non-English-speaking customers, it necessarily assumed a fiduciary relationship. Plaintiffs cite no authority for that proposition, however, and the caselaw belies it. To establish a fiduciary relationship,

Plaintiffs must submit "substantial evidence showing some dependency by one party <u>and</u> some undertaking by the other party to advise, counsel, and protect the weaker party." <u>Lanz</u>, 764 F. Supp. at 179 (emphasis added).  At most, Plaintiffs have claimed (without evidence) that SunTrust knew that they were dependent on the Bank, but they offer no allegation (much less evidence) that it agreed to advise, counsel, or protect them.  Instead, their relationship with Defendant appears typical of any bank with its customer: Scherban opened a savings account, deposited money, and could have withdrawn sums as needed; there is no evidence that he contracted for any special treatment or extra services.

The same result obtains even if Plaintiffs <u>expected</u> SunTrust to protect their interests, as "[t]he fact that one party places trust or confidence in the other does not create a confidential relationship in the absence of some recognition, acceptance or undertaking of the duties of a fiduciary on the part of the other party." <u>Id.</u>; <u>see also</u> <u>Jaffe v. Bank of Am., N.A.</u>, 667 F. Supp. 2d 1299, 1319-20 (S.D. Fla. 2009) ("One may not . . . unilaterally impose a fiduciary relationship [on a bank] without a conscious assumption of such duties by [that bank] to be held liable as a fiduciary.") (quoting <u>Motorcity of Jacksonville</u>, Ltd. v. Se. Bank N.A., 73 F.3d 1317, 1339 (11th Cir. 1996)).  Indeed, a contrary rule would have absurd results: no bank could serve a foreign customer — or one with limited English proficiency — without automatically assuming a host of concomitant responsibilities.  Florida's fiduciary law does not reach so broadly.  <u>See, e.g.</u>, <u>Lanz</u>, 764 F. Supp. at 179 (finding no fiduciary duty between savings and loan and customers, despite plaintiffs' allegation that they were "not well versed in English").

Ruslan and Trudel also suggest that SunTrust exercised "full control" over their assets, as the account languished for years with no "client-initiated activities," and "Nikitina's death had been published" pursuant to Florida probate law.  <u>See</u> Pl. Opp. to MSJ at 8.  This argument, too,

misses the mark. While Trudel and Ruslan may have, in fact, failed to exercise control over the account, their entire suit is premised on the idea that they <u>retained</u> such a right. Indeed, they vigorously dispute authorizing SunTrust (or any other person) to unilaterally disburse or transfer funds from the account. <u>See</u> ECF No. 92-1 (Second Affidavit of Ruslan E. Scherban), ¶ 9 (stating Ruslan "remained the sole person with authority to withdraw funds from [the] joint savings account"). Plaintiffs, accordingly, never entered into an "established relationship of trust and confidence" in which SunTrust assumed "extensive control" over the assets. <u>See</u> <u>Arbitrajes Financieros, S.A.</u>, 2014 WL 11369632, at *5; <u>Capital Bank</u>, 644 So. 2d at 518 (noting fiduciary relationship exists only when one party actually "repose[s]" confidence in another) (citation omitted).

All told, Florida law presumes that no fiduciary duty arises from a bank-customer relationship, and Plaintiffs do nothing to overcome that presumption. With no fiduciary duty (and no allegation that this case involves especially complex transactions), Trudel and Ruslan have no ground for the equitable remedy of accounting. The Court therefore grants SunTrust's Motion on that count.

B.    <u>Fraudulent Concealment</u>

Next up is fraudulent concealment. In its last Opinion, the Court allowed Plaintiffs to pursue one count on that basis. <u>See</u> <u>Trudel</u>, 223 F. Supp. 3d at 93-94. At the time, they alleged that SunTrust had, on at least six separate occasions since November 2015, made misleading representations about whether it retained records of the 5216 account. <u>Id.</u> at 93. Defendant now moves for summary judgment, and Trudel and Ruslan offer no real response to that Motion (save for some discovery complaints).

Instead, they pose a new theory of fraudulent concealment, one wholly unrelated to their original briefing on that count. See Pl. MSJ at 7-15; Pl. Opp. to Def. MSJ at 7-15. Although their Motion is somewhat opaque, Plaintiffs appear to seek "summary adjudication" on two issues: 1) that SunTrust violated Florida's escheat rules; and 2) that the Bank violated its own internal policy of retaining records of abandoned or escheated accounts for twenty years. See Pl. MSJ at 3. They believe legal determinations on those points would "simpli[fy] the issues on the cause of action for fraudulent concealment." Id. The Court thus begins there, before turning to Plaintiffs' original grounds for relief.

### 1. Failure to Escheat

Plaintiffs' latest theory unfolds as follows: (1) Florida escheat laws require a bank to turn over unclaimed property after 5 years, see Fla. Stat. § 717.106(a); (2) according to a June 2002 letter from SunTrust, there was no client-initiated activity in the account since March 1, 1995, see Pl. MSJ, Exh. B; (3) the property thus became unclaimed on March 1, 2000; and (4) SunTrust was obligated to report that unclaimed money to the state of Florida by no later than May 1 of the following year (i.e., May 1, 2001). See Fla. Stat. § 717.106(1), (3). Plaintiffs argue — without fully explaining why — that the Bank's failure in this regard "automatically resulted in fraudulent concealment from the beneficiaries of the claims here." Pl. MSJ at 14. They therefore ask the Court to hold, as a matter, of law, that SunTrust violated Chapter 717.

The Court has seen a variant of this argument before. At the motion-to-dismiss stage, Plaintiffs similarly contended that "SunTrust closed [the 5216] account in January 2003, apparently following years of inactivity." Trudel, 223 F. Supp. 3d at 86. Rather than "giving that unclaimed property to the State of Florida, where perhaps the sons could lawfully reclaim it, SunTrust then kept the money for itself." Id. At the time, however, Trudel and Ruslan did not

frame this conduct as fraudulent concealment; instead, they brought eight common-law counts (Counts I–VII, XII) related to these acts: conversion or confiscation, breach of contract, negligence, breach of fiduciary duty, fraud, unjust enrichment, money had and received, and constructive trust.  Id.

The Court rejected each of those claims as time-barred under the applicable statute either of limitations or repose.  Id. at 90.  Undeterred, Plaintiffs now try to shoehorn the same theory into their extant fraudulent-concealment count.  That strategy, however, suffers from several flaws, not the least of which is that these allegations are nowhere to be found in Count X of Plaintiffs' Second Amended Complaint or in its briefing at the motion-to-dismiss stage.  Instead, Count X mentioned only actions taken <u>during</u> litigation — i.e., after Plaintiffs filed suit in November 2015.  See SAC, ¶¶ 167-74.  The new allegations, regarding behavior from 2000 to 2003, "amount[] to a fundamental change in the nature of" this count.  See Teltschik v. Williams & Jensen, PLLC, 683 F. Supp. 2d 33, 42 (D.D.C. 2010).  "It is well established that a party may not amend its complaint or broaden its claims through summary judgment briefing."  District of Columbia v. Barrie, 741 F. Supp. 2d 250, 263 (D.D.C. 2010).  The Court could toss the allegation on that ground alone.

In any event, had Plaintiffs raised this theory originally, it would have met the same fate as its peers.  To wit, the Court would have held that the action was untimely, as it did for the other eight counts brought on this basis.  As the Court explained then, Florida's statute of repose provides that "an action for fraud . . . must be begun within 12 years after the date of the commission of the alleged fraud, regardless of the date the fraud was or should have been discovered."  Trudel, 223 F. Supp. 3d at 87 (quoting Fla. Stat. § 95.031(2)(a)) (emphasis omitted).  "Trudel and Ruslan allege[d] that SunTrust closed the account in January 2003, yet the

sons did not initiate this lawsuit until November 2015, ten months past the twelve-year repose period." Id.

Although SunTrust did not raise a time-bar defense this go-round, the Court properly does so *sua sponte*. The Florida Supreme Court has distinguished between "jurisdictional statutes of non-claim (repose) and statutes of limitations," only the latter of which is "subject to waiver." Lutheran Bhd. Legal Reserve Fraternal Ben. Soc'y v. Estate of Petz, 744 So. 2d 596, 598 (Fla. Dist. Ct. App. 1999) (citing Barnett Bank of Palm Beach Cty. v. Estate of Read, 493 So. 2d 447 (Fla. 1986)); see also Comerica Bank & Trust, F.S.B. v. SDI Operating Partners, L.P., 673 So. 2d 163, 166 (Fla. Dist. Ct. App. 1996) ("There is a fundamental difference between ordinary statutes of limitations, on the one hand, and statutes of repose or jurisdictional nonclaim statutes, on the other . . . . [The latter] operate to bar untimely claims without any action by the opponent and deprive the court of the power to adjudicate them."). Because a statute of repose is an "absolute jurisdictional bar to a tardily filed claim," this Court must once again consider whether Plaintiffs' claims are time-barred on that ground. Lutheran, 744 So. 2d at 598.

As before, the Court answers affirmatively, since Trudel and Ruslan essentially bring the same claim by another name. The Florida Supreme Court has made clear that the 12-year statute of repose applies to fraudulent-concealment claims, running as soon as "the defendant's last act or omission" occurs. See Hess v. Philip Morris USA, Inc., 175 So. 3d 687, 698 (Fla. 2015). So when was the "last act or omission" here? Under Plaintiffs' theory, SunTrust's last omission giving rise to its fraudulent-concealment claim occurred on May 1, 2001 — the date by which the Bank should have notified Florida of any funds left in the 5216 account. See Pl. MSJ at 13. At the latest, the Court might assume that Defendant's last culpable act was in January 22, 2003, when it allegedly closed the 5216 account without either a) escheating the money to Florida or b)

informing Plaintiffs that money remained. Even including that later act, however, the time limit expired by January 22, 2015, ten months before the current lawsuit arrived.

True, Plaintiffs allege that Defendant committed further acts of fraudulent concealment through its allegedly misleading disclosures during litigation in this case. The Florida Supreme Court has held that "where there is evidence of the defendant's wrongful conduct within the repose period, the statute of repose will not bar a plaintiff's fraudulent concealment claim." Hess, 175 So. 3d at 698. But none of SunTrust's allegedly wrongful conduct occurred "within the repose period." Id. (emphasis added). A statute of repose "effect[s] a legislative judgment that a defendant should be free from liability after the legislatively determined period of time." CTS Corp. v. Waldburger, 134 S. Ct. 2175, 2183 (2014) (internal quotation marks omitted). In other words, once twelve years has passed since the last culpable act, the "statute of repose extinguishes that cause of action altogether." Nat'l Auto Serv. Ctrs., Inc. v. F/R 550, LLC, 192 So. 3d 498, 513 (Fla. Dist. Ct. App. 2016). Here, Plaintiffs allege a wrongful act on January 22, 2003, and then offer no indication of any foul play during the ensuing twelve years. The statute of repose thus kicked in on January 22, 2015, and Trudel and Ruslan cannot revive that claim from the dead by tacking on allegations of misconduct that occurred after the clock had run out. The Court must therefore reject their Motion for Partial Summary Judgment brought on that basis, and it similarly determines that a rewriting of this count does not prevent summary judgment being awarded to SunTrust.

### 2. *Failure to Follow Internal Policy*

Plaintiffs also suggest that SunTrust violated its own record-retention policies. Specifically, they cite an internal policy of retaining "[r]ecords related to escheated/abandoned property [for] 20 years." Pl. MSJ at 16. Because the Bank kept records relating to the 5216

account for only seven years, Plaintiffs ask the Court to hold as a matter of law that it "failed and/or refused to comply with its own" policy. Id. at 17. This is an odd request, and one that need not detain the Court for long. As explained above, SunTrust never treated the property in the account as abandoned or escheated, so it had no reason to retain the records for 20 years. And, in any event, Plaintiffs supply no explanation for why SunTrust's violation of its own internal policy would give rise to any cause of action (much less one for fraudulent concealment). The Court thus cannot provide any relief on that ground.

### 3. Failure to Disclose Third-Party Relationships

That brings the Court back to where it started: SunTrust's allegedly misleading disclosures during litigation. To refresh the reader, Plaintiffs previously alleged that they had sought information about the various Scherban holdings from SunTrust. See SAC, ¶ 91. Defendant repeatedly responded that it had "reviewed the records at SunTrust Bank to determine if there were any accounts" and concluded that it "no longer has any records in its system." ECF No. 38-1 (Affidavit of John A. Barry), ¶¶ 3, 8; see SAC, ¶¶ 92-93 (quoting Barry Affidavit). According to Ruslan and Trudel, these representations omitted the crucial fact that SunTrust never held on to information for closed accounts in the first place. See SAC, ¶ 94. Old account information would thus not be "at" the Bank or in "its system." Instead, Plaintiffs alleged that SunTrust outsourced its archiving services, first to Iron Mountain Information Management LLC and, beginning in February 2002, to Viewpointe Archives Services LLC. Id., ¶¶ 95-96. Under this theory, Defendant should have directed Plaintiffs to Iron Mountain or Viewpointe to search for their account information. Id., ¶¶ 97-99. This omission, Plaintiffs said, crippled their protracted search for their assets. Id., ¶¶ 166-74.

To proceed on that basis, Plaintiffs must show that (1) Defendant concealed or failed to disclose a material fact, (2) it knew or should have known that fact should have been disclosed, (3) it knew that its concealment or nondisclosure would induce Plaintiffs to act, (4) it had a duty to disclose the fact, and (5) Plaintiffs detrimentally relied on the misinformation. See Hess, 175 So. 3d at 691 (quoting Philip Morris USA, Inc. v. Hess, 95 So. 3d 254, 259 (Fla. Dist. Ct. App. 2012)); R.J. Reynolds Tobacco Co. v. Martin, 53 So. 3d 1060, 1068 (Fla. Dist. Ct. App. 2010). The Court previously found Plaintiffs' Complaint had sufficiently stated a claim on this count but cautioned that "[i]t may be the case that [the] undisclosed facts about outside vendors are not ultimately material or harmful (especially given that those companies may have discarded the relevant files)." Trudel, 223 F. Supp. 3d at 93.

And so it came to be. After Plaintiffs subpoenaed Viewpointe, the company informed them that, while it "maintains a check archive on behalf of SunTrust, in which SunTrust stores checks drawn on its accounts," it found no records related to Scherban's various accounts. See Def. MSJ, Exh. 11 (Affidavit of James Randolph Thomas), ¶ 3; id., Exh. A at 2-3. This comes as no surprise because, as Plaintiffs themselves admit, "[T]he joint savings account ending 5216, at issue here, has had no checking privilege." Pl. Opp. to Def. MSJ at 35. Viewpointe thus could not possibly have maintained a check archive for that account, and it follows that SunTrust did not "conceal[] or fail[] to disclose a material fact" when it declined to mention its relationship with that vendor. See Hess, 175 So. 3d at 691. Indeed, Plaintiffs now criticize SunTrust for allowing them to subpoena Viewpointe in the first place, as such action has proved "a waste of time and resources." Pl. Opp. to Def. MSJ at 35. Needless to say, they seem to have abandoned any claim related to Defendant's concealing its relationship with that company.

That leaves Iron Mountain. In its subpoena response, the company reported that it had located a now-defunct Customer ID number "for SunTrust's branch at 800 S. Federal Highway, Boca Raton, FL 33432." Def. MSJ, Exh. 10 at 1. Its account with SunTrust, however, "is inactive and has been for several years." Id. "All inventory was either permanently withdrawn or destroyed and Iron Mountain no longer has access to this account." Id. As the vendor never retained "file level" information for its customers, it is unable to determine "what was in any individual carton stored." In other words, it cannot confirm or deny whether it ever stored records related to Account 5216 (or any other Scherban account). Iron Mountain can say definitively, however, that if it did house such records, it no longer does.

Given that Iron Mountain has "discarded the relevant files," this Court, too, must jettison Plaintiffs' fraudulent-concealment claim. See Trudel, 223 F. Supp. 3d at 93. At best, SunTrust knew all along that the vendor had no relevant files, and they thus never concealed or failed to disclose a material fact. See Hess, 175 So. 3d at 691. At worst, it believed that Iron Mountain could have records and did not disclose such fact to Plaintiffs. But Trudel and Ruslan's reliance (if any) on that representation was not detrimental. As an initial matter, Plaintiffs never took SunTrust's word that it "no longer has any records in its system." Instead, they diligently conducted their own search for those documents, ultimately issuing subpoenas to the vendor. See Def. MSJ, Exhs. 10, 11. In any event, even had SunTrust disclosed its relationship with Iron Mountain, that company would have no relevant records for Plaintiffs.

Indeed, Plaintiffs do little to defend their fraudulent-concealment claim, instead devoting fewer than two pages to "SunTrust's Declination to Produce Contractual Documents" relating to Iron Mountain. See Pl. Opp. to Def. MSJ at 33. They hint at opposing summary judgment only by maintaining (without explanation) that "whether or not SunTrust in fact has had a contractual

relationship with Iron Mountain" has "ripened into a triable issue." Id. at 35. It is Civil Procedure 101, however, that parties must have a "dispute about a material fact [that] is genuine" to proceed to trial. Liberty Lobby, 477 U.S. at 248 (internal quotation marks omitted) (emphasis added). Here, Plaintiffs may dispute SunTrust's relationship with Iron Mountain, as Trudel and Ruslan have repeatedly asked the Bank to produce its contract and retention agreement with the vendor, but "SunTrust continued to deny that it has ever had a contract with Iron Mountain and has produced none." Pl. Opp. to Def. MSJ at 34.

This dispute, however, proves immaterial to resolving Plaintiffs' claim. As discussed above, regardless of whether SunTrust once contracted with Iron Mountain to store data, the latter no longer maintains records related to the 5216 account. While Plaintiffs level plenty of shots against SunTrust, they do nothing to impugn Iron Mountain's veracity, nor do they allege that the vendor might still actually maintain records of the account. The Court therefore concludes that there is no dispute of "material fact[s]" related to the fraudulent-concealment count, as none of the points in contention is capable of "affect[ing] the outcome of the suit." Liberty Lobby, Inc., 477 U.S. at 247-48 ("Factual disputes that are irrelevant or unnecessary will not be counted."). It grants Defendant summary judgment on that basis.

C.      Discovery Violations

Plaintiffs alternatively move under Federal Rule of Civil Procedure 56(d) to defer any ruling on summary judgment, alleging that they have not yet received an adequate opportunity to conduct discovery. See ECF No. 88. To resolve the Motion, the Court first recounts this case's lengthy discovery history before turning to Plaintiffs' alleged deficiencies.

*1. Background*

On January 27, 2017, having dismissed much of the case, the Court authorized Plaintiffs to conduct discovery on their remaining counts, starting with interrogatories, requests for production of documents, and requests for admissions from SunTrust. See Minute Order. It also permitted the issuance of the aforementioned subpoenas to Iron Mountain and Viewpointe, both of which duly responded. See Def. MSJ, Exhs. 10, 11.

SunTrust, too, answered each document request and provided approximately 1,000 responsive pages. See ECF No. 84 (Def. Opp. to Motion to Compel) at 2. Those documents included a portion of the Bank's document-retention policy, several versions of its Rules and Regulations from 1995 through 2013, and the Bank's agreement with Viewpointe. Id. at 2 n.1. SunTrust redacted portions of its Records Retention Policy, purportedly because that information is not generally available to the public or to its customers. Id. at 2 n.3. It also removed certain pages from the Policy that it deemed irrelevant, although it produced a "table of contents" so that Plaintiffs could discern which portions were omitted. Id. Those sections apparently related to the Bank's retention schedule for such internal records as "administration, finance, human resources, lending, marketing and communications" — *i.e.*, regulations with no bearing on a customer's bank account. Id.

After written discovery concluded, the parties convened before the Court on April 27, 2017, for a status hearing. Plaintiffs there asked for additional third-party discovery, and the Court (over SunTrust's objection) agreed to extend the deadline so that they could subpoena two law firms in Florida, each of which had addresses listed on SunTrust's screenshots of the 5216 account. See Minute Order. Plaintiffs did so, and the parties returned for another status hearing on July 26, 2017. During that conference, Plaintiffs pitched two more requests: First, they asked

SunTrust to turn over additional screenshots of the 5216 account.  Second, they sought an

additional sixty days to conduct depositions.  Over objections from Defendant, the Court granted

both of these requests as well.  See Minute Order.

     Originally, Plaintiffs stated that they wished to depose John Barry (Former Vice

President and Counsel for SunTrust), who executed an affidavit in this matter, and Cindy

Negron, a former employee who left SunTrust in 2005.  The day after the July status conference,

counsel for Plaintiffs asked to take three additional depositions: (1) Russell T. McAndrew, a

former branch manager at the SunTrust Boca Raton branch who left the Bank in July 2002; (2)

Janice Bucher, a former employee at that branch who left in July 1999; and (3) the person "most

knowledgeable" about SunTrust's contracts for archiving documents.  See ECF No. 74 (Def.

Mot. for Protective Order) at 4.  In a now-familiar pattern, SunTrust objected to each deposition,

except to one for a corporate designee, as they related to the claims that had been dismissed.  Id.

at 6.  Plaintiffs countered that the causes of action were dismissed "without prejudice," and they

believed this discovery could prove fruitful in amending their Complaint.  See ECF No. 75 (Pl.

Opp. to Protective Order) at 3.  In an abundance of caution, the Court denied SunTrust's Motion

for a Protective Order on August 15, 2017, allowing the depositions to proceed during the

ensuing month.  See Minute Order.

     Perhaps not surprisingly, each deposition had hiccups (including scheduling difficulties

due to Hurricane Irma), but the crux of the parties' dispute turns on the deposition of SunTrust's

corporate designee.  Under Federal Rule of Civil Procedure 30(b)(6), a plaintiff may depose an

organization (like SunTrust) and "describe with reasonable particularity the matters for

examination."  That organization must then designate at least one officer to "testify about

information known or reasonably available to the organization."  Id.

Plaintiffs so moved, and after amending the scope of this deposition several times, sought a person knowledgeable about (1) the archiving and handling of accounts at SunTrust's 800 S. Federal Highway, Boca Raton, Florida, branch; (2) "Dispatch of archived materials" from that branch with Iron Mountain; (3) the branch's contract with Iron Mountain; (4) how the branch handled the Scherban-Nikitina family accounts; (5) the branch's authority to implement outgoing wire transfers per instructions received by fax; (6) "Operation of the 'ARGO Sales and Service'" software used at the branch, "including but not limited to incorporation of the data system used in 1995-2003, data archiving, procedure for access, logs-in and retrievals of data missing for any reason"; and (7) operations of the branch's Departments of Dormant Accounts and of Returned Mail. See ECF No. 76 (Pl. Mot. to Compel), Exh. A at 2.

SunTrust ultimately selected John Barry as its corporate designee (the same counsel and former Vice President who also testified in his individual capacity). To prepare, Barry apparently consulted an employee with SunTrust's Operations Center in Richmond, Virginia, to gain additional information on the Argo Software System, which ran Channel Link, the company's internal banking system. See ECF No. 84 (Def. Opp. to Mot. to Compel), Exh. A (Deposition of John Barry) at 8-10. He asked that employee (1) to do another search for the Scherbans in the Bank's Channel Link system, (2) to explain the precursor bank systems before Channel Link, including one known as the A.M. Teller System, and (3) to describe what the department would do to recover missing information from Channel Link. Id. Based on those conversations (and his personal knowledge), Barry testified to some of the basics regarding Channel Link, including how employees logged in, how the software recorded such log-ins, and any modifications to data on that interface. Id. at 36-38. When pressed, however, he struggled to answer more technical questions about the Channel Link servers and software. Id. at 38-41.

After SunTrust declined to supplement Barry's testimony, Plaintiffs moved to compel it to produce a "Rule 30(b)(6) witness who is duly prepared and who is in a position to answer questions, at least on the groups of questions Nos. 6 and 7 in the Notice of the Deposition." ECF No. 76 at 19. They also asked this Court to order SunTrust to supplement its discovery under Federal Rule of Civil Procedure 26(e), which requires parties to provide additional discovery upon learning that its previous disclosures were "incomplete or incorrect" "in some material respect." Specifically, Trudel and Ruslan asked the Court to compel Defendant to (1) supplement, remove redactions, or provide a privilege log with respect to SunTrust's retention policy, and (2) produce extracts from its in-house technical operating instructions for archiving and deleting data regarding accounts. See Pl. Mot. to Compel at 19

While that Motion was pending, SunTrust moved for summary judgment, and Plaintiffs responded with the instant Rule 56(d) Motion, asking the Court to put the proceedings on ice until the Bank complied with their additional discovery requests. The Court turns now to that Motion.

### 2. Rule 56(d) Motion

Under Rule 56(d), a court may defer considering a motion for summary judgment, deny the motion, or allow time for the non-movant to obtain affidavits or declarations or to take discovery if that party "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Such an affidavit must state "with sufficient particularity why additional discovery is necessary." United States ex rel. Folliard v. Gov't Acquisitions, Inc., 764 F.3d 19, 26 (D.C. Cir. 2014) (citation and internal quotation marks omitted). Specifically, the non-movant's affidavit must: (1) "outline the particular facts the non-movant intends to discover and describe why those facts are necessary to the litigation," (2)

"explain why the non-movant could not produce the facts in opposition to the motion for summary judgment," and (3) "show the information is in fact discoverable." Id. (citations and internal quotation marks omitted).

The Court concludes that Plaintiffs fail on the first prong. Although they allege a bevy of discovery deficiencies, they cannot show why any of those missing facts are "necessary" to the litigation. To wit, Plaintiffs seek the following:

- To depose another Rule 30(b)(6) witness who is more familiar with the ARGO system, as well as the operations of the Boca Raton branch's Departments of Dormant Accounts and of Returned Mail;

- An unredacted version of SunTrust's policies regarding data retention (or a privilege log justifying the redacted versions); and

- Extracts from the in-house operating instructions for archiving and deleting data concerning the accounts.

Pl. Rule 56(d) Mot. at 20. Each of these requests relates, at bottom, to SunTrust's data-retention practices and whether the Bank might still retain (or could recover) information pertaining to Scherban-family accounts. Plaintiffs proffer testimony from four purported IT experts, who attest that the "accounts' data" is likely "recoverable by the IT engineers," and that the experts are "nearly certain . . . that the data on the accounts is still contained on SunTrust's servers." Id. Had SunTrust complied with their discovery obligations, they theorize, "that would have been discovered very quickly." Id.

The Court sympathizes with Plaintiffs' frustration that SunTrust cannot account for their missing million dollars. Even if the most likely culprit is Alexeenko, see, e.g., First Scherban Decl., ¶¶ 4-5, 10; SAC, ¶¶ 85-86, it is not unreasonable that they should expect the Bank to shed more light on what transpired. Unfortunately for Trudel and Ruslan, however, the Court's summary-judgment ruling does not turn on whether SunTrust might still recover data from the

5216 account.  Rather, even assuming the Bank could do so, the Court granted judgment on the accounting count because no fiduciary relationship exists between the parties.  Likewise, it rejected Plaintiffs fraudulent-concealment theories given the statute of repose and discovery showing that neither Iron Mountain nor Viewpointe retains relevant records.  At this stage, it is simply irrelevant to these counts whether SunTrust still retains or could recover more information about the 5216 account.

In the end, Rule 56(d) is "intended to prevent railroading a non-moving party through a premature motion for summary judgment before the non-moving party has had the opportunity to make full discovery." Milligan v. Clinton, 266 F.R.D. 17, 18 (D.D.C. 2010) (citations and internal quotation marks omitted).  Here, Plaintiffs had a full opportunity to conduct discovery on their remaining claims — and, indeed, the Court has granted them significant latitude to do so.  Based on that discovery, the Court has all the information needed to rule on summary judgment, and none of Plaintiffs' proposed avenues for discovery could yield facts that would change the outcome.  The Court therefore must deny their Rule 56(d) Motion, as well as their related Motion to Compel.

D.    Leave to Amend

Finally, in their Opposition to Defendant's Motion for Summary Judgment, Plaintiffs "reserve[]" their "request to be allowed to re-amend the pleadings after the phase of discovery." Pl. Opp. to Def. MSJ at 36.  As the D.C. Circuit has often reiterated, however, "[A] request for leave [to amend] must be submitted in the form of a written motion." Benoit v. U.S. Dep't of Agric., 608 F.3d 17, 21 (D.C. Cir. 2010) (citation and internal quotation marks omitted; second alteration in original).  Moreover, "[i]t is well-established in this district that a plaintiff cannot amend his Complaint in an opposition to a defendant's motion for summary judgment." Jo v.

<u>District of Columbia</u>, 582 F. Supp. 2d 51, 64 (D.D.C. 2008); <u>DMSC, Inc. v. Convera Corp.</u>, 479

F. Supp. 2d 68, 84 (D.D.C. 2007) (rejecting plaintiff's attempt to broaden claims and thereby

amend complaint in opposition to summary-judgment motion).  Plaintiffs' request for leave to

amend here (which they acknowledge also fails to include "a proposed amended pleading") is

therefore improper, and the Court denies it.

**IV.     Conclusion**

For the foregoing reasons, the Court grants SunTrust summary judgment and denies

Plaintiffs' Cross-Motion.  It also denies Plaintiffs' Motion for Relief under Rule 56(d), as well as

their related Motion to Compel.  A contemporaneous Order to that effect will issue this day.


<u>/s/ *James E. Boasberg*</u>
JAMES E. BOASBERG
United States District Judge


Date:   January 25, 2018